UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x

LAURIE GUNST,                           :

      Plaintiff,                   :

                                Civil Action No.
    v.                                  :   05 CV 2626 (DAB)

EDWARD SEAGA,                           :   COMPLAINT FOR
                                            DECLARATORY JUDGMENT
      Defendant.                   :

-------------------------------------------------------x

      Plaintiff, Laurie Gunst, by her attorneys, Peter R. Ginsberg P.C. and Robert N. Solomon, alleges as follows:

## NATURE OF ACTION

      1.  This is an action for declaratory judgment, pursuant to 28 U.S.C. Section 2201, to resolve defamation claims purportedly arising from a radio interview transmitted from New York and broadcast on a radio program aired in Jamaica called "The Breakfast Club."

## PARTIES, JURISDICTION AND VENUE

      2.  Plaintiff Laurie Gunst is a citizen of the State of New York and resides in New York County.

      3.  Defendant Edward Seaga is, upon information and belief, a resident of Kingston, Jamaica, a citizen of Jamaica, and regularly travels to, and regularly conducts business in, New York.

      4.  This Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. Section 1332, because Plaintiff is a citizen of New York and Defendant is a citizen or subject of a foreign state within the meaning of 28 U.S.C. Section 1332(a)(2), and the amount in

controversy, exclusive of interest and costs, exceeds $75,000.

5. Venue is proper, pursuant to 28 U.S.C. Section 1391(2), because "a substantial part of the events or omissions giving rise to the claim occurred" in this district.

## FACTUAL ALLEGATIONS

6. Laurie Gunst is a renowned historian and an accomplished author. Among her works is a non-fiction book, published in 1995, entitled *Born Fi' Dead*, published in the United States by Henry Holt Co. Inc.

7. Edward Seaga is a long-standing member of the House of Parliament for Western Kingston and was Prime Minister of Jamaica from 1980 – 1989, and leader of the Opposition party from 1989 to the present. Defendant Seaga was born in the United States, attended University in the United States, and, upon information and belief, has traveled regularly to the United States, including New York, throughout his political career in order to develop business and political connections and support.

8. In *Born Fi' Dead*, Plaintiff Gunst provided a detailed account of the link between Jamaican politics and gang violence and, in particular, Defendant Seaga's involvement with a criminal organization in Jamaica, known as a "Posse." The Posse with which Mr. Seaga was linked regularly conducted the business of illegal drug trafficking, including cocaine trafficking, and engaged in violent crime. Among other factual information, Plaintiff Gunst in *Born Fi' Dead* provided significant detail of Defendant Seaga's history with a person by the name of Delroy Edwards, who was prosecuted in the United States District Court for the Eastern District of New York, *United States v. Delroy Edwards, et al.*, resulting in Mr. Edwards' conviction. Upon information and belief, Defendant Seaga currently is considering running once again for the position of Prime Minister of Jamaica.

9. Following publication of *Born Fi' Dead*, Plaintiff Gunst served as an expert on Jamaican politics and history in a variety of forums, including, at times, as a consultant for the United States Government.

10. On September 3, 1999, Ms. Gunst was asked to participate in the radio show *The Breakfast Club*, for broadcast in Jamaica on HOT 102 FM. Upon information and believe, that station is owned and operated by Western Broadcasting Services Limited.

11. Throughout the September 3, 1999 broadcast, Plaintiff Gunst remained in New York.

12. During the course of the September 3, 1999 broadcast, the show's hosts, Anthony Abrahams and Beverly Anderson-Manley, wife of former Prime Minister Michael Manley, asked Plaintiff Gunst about a former Posse member, Jim Brown, the convicted founder of an international narcotics trafficking organization who was assassinated while incarcerated in Jamaica. In response to inquiries, Plaintiff Gunst said there exist facts supporting the claim that Mr. Brown's Posse received its early financial support from Mr. Seaga and members of his political party, the JLP. Plaintiff Gunst then referenced certain passages in *Born Fi' Dead*, repeating that Defendant Seaga "wanted [Mr. Brown] dead because Jim Brown, had he been extradited to the United States would have sung like a canary, and sang everything he knew . . . from the last '70s on, in terms of . . . JLP's involvement . . . and connivance in the drug trade. That was not gonna happen." In following up that statement, Plaintiff Gunst stated that the information was "speculation," but that "I certainly have an awful lot of sources who think that's what happened." Plaintiff Gunst also stated that she could probably not prove who was responsible for Mr. Brown's death in a court of law: "[T]his is certainly where all of our hands are tied, but it doesn't stop us from listening to the voice of the thousands of informants."

13. During the interview, Plaintiff Gunst also was asked about the assassination of

Chocomo Lawn, a political rival of Defendant Seaga.  Asked whether "Claudie Massop was gunned down by JLP and not by the police," as was alleged, Plaintiff Gunst responded: "I think he may well have been because he had become dangerous.  He had accosted Mr. Seaga at several public occasions and questioned him."

14. On or about November 26, 1999, Defendant Edward Seaga commenced defamation proceedings in Jamaica against Plaintiff Laurie Gunst, Western Broadcasting Services Limited, The Breakfast Club Limited and Anthony Abrams.  Plaintiff Gunst was ostensibly served pursuant to a Notice of Concurrent Writ of Summons, dated August 18, 2003, by service of a copy of the Statement of Claim upon her London-based publisher, Cannongate Books Limited, the publisher of *Born Fi' Dead* for non-United States circulation.  On January 17, 2005, Mr. Seega ostensibly was granted an "Interlocutory Judgment in Default."  Said document was mailed to Ms. Gunst's publisher in London, England, then forwarded to another third party, and only provided to Ms. Gunst on or about February 15, 2005.  The Judgment has never been properly served upon Ms. Gunst.

15. There is precedence for courts in the United States to refuse to enforce defamation judgments rendered by courts based upon English law, such as courts in Jamaica, due to public policy concerns for protecting freedom of speech, journalism, and the free flow of ideas.  *E.g. Telnikoff v. Matusevitch*, 702 A.2d 230 (Md. 1997), *aff'd Matusevitch v. Telnikoff,* 1998 U.S. App. LEXIS 10628 (D.C. Cir. May 5, 1998); *Bachchan v. India Abroad Publications, Inc.*, 154 Misc. 2d 228  (NY Co. 1992).

16. There are many reasons underlying the United States courts' refusal to enforce defamation judgments predicated by English law.   The United States system is based upon a

commitment to vigorous and free debate and commentary concerning matters of public interest. Certainly, the corruption of a foreign leader fits within that scope of topics warranting protection. In contrast, the common laws of the United Kingdom, which are used in Jamaica, are not designed to protect free speech or free debate. For instance:

- In contrast to challenged statements in the United States, allegedly defamatory statements in systems governed by the jurisprudence of the United Kingdom are presumed to be false;
- Under the English law, the defendant carries the burden of proving the allegedly defamatory statements to be true;
- Defamation is essentially a strict liability tort under the English system. As a result, the plaintiff does not have any burden to prove that the libel defendant published the allegedly actionable statements with any form of fault, whether negligence or willfulness;
- Pivotal in describing the difference between the two systems, English defamation law not only does not recognize, but, in fact, champions principles diametrically opposed to the principles embodied in *New York Times v. Sullivan*, 376 U.S. 254 (1964), and *Gertz v. Robert Welch*, 418 U.S. 323 (1974), two cases that form the cornerstone of our laws protecting free speech. Indeed, under the English system, not only is there no special protection for actions focused upon political debate or comment, or actions based upon the words or activities of a public figure, but large damage awards in such actions are far from unusual;
- There are procedural rules that result in consequences that simply would not be

tolerated in the United States. For example, in the case at bar, if Plaintiff Gunst were to participate in the Jamaican action and attempt to prove the truth of her statements, and fail, Defendant Seaga could be awarded aggravated damages. Indeed, lack of success in defending the Jamaican action almost necessarily would result in an award against Plaintiff Gunst that included, in addition to a significant award, both attorney's fees and costs.

17. As a result of these contrary principles, any defamation judgment rendered in Jamaica would most likely be unenforceable in the United States. Nonetheless, that does not mean that Plaintiff Gunst can find comfort in the fact of unenforceability. Refusing to participate in the Jamaican proceedings apparently has resulted in a default judgment crafted into the shape of a political football and aimed at destroying Plaintiff Gunst's extraordinary reputation along with the factually-based and vital information provided in *Born Fi' Dead*.

18. Participating in the Jamaican litigation presented and continues to present extraordinary risks and barriers. Traveling to Jamaica and presenting a defense would be prohibitively expensive. Moreover, waging a full and effective defense is virtually impossible. First, as reflected in the attached Affidavit, Plaintiff Gunst would most certainly be placed in enormous physical danger if she were to return to Jamaica. Similarly, any witness called to testify in her behalf would be compromised. Finally, many of the witnesses to the events relevant to Plaintiff Gunst's interview with *The Morning Show* are incarcerated, dead, or otherwise unavailable to offer evidence. Those who are incarcerated are subject to jurisdiction in the United States and could be compelled to testify in New York, but, in contrast, would not be available for proceedings in Jamaica. Moreover, the prosecutors and federal agents who

investigated relevant matters are within the jurisdiction of this Court but would not be available in Jamaican proceedings.

19. Litigation in the United States would promise an end to the underlying dispute, whereas a lawsuit in Jamaica would hold out no such promise. Courts in this country recognize a `single publication' rule in defamation cases. *See, e.g., Keeton v. Hustler* Magazine, 465 U.S. 770, 777 (1984), *citing Restatement (Second) of Torts Section 577A*. According to this principle, only one action regarding *The Morning Show* interview could be brought, damages suffered in all jurisdictions could be consolidated within a United States court, and a judgment would bar any other actions between the same parties in any other jurisdiction. Jamaican courts, like all courts governed by the British legal system, do not recognize the `single publication' rule, instead permitting a separate action for each publication in each jurisdiction where the broadcast was heard.

## DISTINGUISHING DOW JONES V. HARRODS, LIMITED

20. In litigation in the Southern District of New York entitled *Dow Jones & Company, Inc. v. Harrods, Limited and Mohamed Al Fayed*, 237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003), Honorable Victor Marrero rendered a comprehensive analysis of a defamation defendant's request for declaratory relief similar to Plaintiff Gunst's request in the case at bar. Judge Marrero denied the requested relief in *Harrods*, while recognizing the appropriateness of declaratory relief directed at foreign litigation under certain circumstances. The case at bar is distinguished from the *Harrods* litigation in material ways.

21. In *Harrods*, the Court recognized that, in contrast to most Declaratory Judgment actions, the party seeking relief in *Harrods* faced only "potential liability" and the opposing party had an "accrued claim . . . but has not yet commenced coercive litigation." 237 F. Supp. 2d at 405. In contrast, the danger for Plaintiff Gunst has already ripened, with a lawsuit filed and service of the foreign writ, albeit unconventional and questionable, already made, and a Judgment, also inappropriately served upon Ms. Gunst, already obtained. The controversy here, therefore, is sufficiently "real and immediate" to justify declaratory relief.

22. In *Harrods*, the Court cautioned that "considerable doubt exists as to whether the liability and other harms Dow Jones fears are in fact sufficiently real and immediate or may not come to pass at all." 237 F. Supp. 2d at 403. In the case at bar, the fears have already materialized: 1) Plaintiff Gunst, in contrast to the corporate party in *Harrods,* cannot afford the enormous expense of litigating an action in Jamaica, and does not have a presence in Jamaica, having only broadcast a radio interview from her apartment in New York, in contrast to having an ongoing commercial undertaking in the foreign jurisdiction, as in *Harrods*; and 2) Plaintiff Gunst would be in serious physical harm if she were to litigate the action in Jamaica, in contrast to the defamation defendant in *Harrods*. Thus, failure of the Court to exercise jurisdiction here would force Plaintiff Gunst to risk immediate physical, as well as financial, devastation, or, instead, to stand paralyzed and without being able to proffer a defense while being subjected to what assuredly will be a highly-charged and publicized proceedings and, ultimately, default judgment. In *Harrods*, the perceived danger to the defamation defendant was in essence the expense and inconvenience of litigating such an action in England, where, as noted above, it was already doing business 237 F. Supp. 2d at 418 – 419. Here, the dangers of denying jurisdiction and relief under the Declaratory Judgment Act lie not only in the vexatiousness of an action

already commenced in Jamaica, but, more importantly, being denied fair access to the judicial system.

23. In *Harrods*, the subject matter of the controversy revolved around an admittedly foolish and mocking article. 237 F. Supp. 2d at 409. Here, the subject matter could not be more serious. Allowing oppressive litigation in Jamaica to proceed, unopposed and without counterbalance, against United States-generated speech would have precisely the kind of chill on the exercise of First Amendment freedoms that the extraordinary relief herein requested was designed to prevent. Moreover, the subject matter is of a nature that clearly provides the Court with jurisdiction.

24. In *Harrods*, it was difficult to discern in which forum the parties would have been more readily able to present witnesses and evidence and to address appropriate defenses, 237 F. Supp. 2d at 442 – 443. Here, there can be no question but that the underlying controversy, and serious claims brought by Defendant Seaga, could only be adjudicated fairly and comprehensively in the instant Court. As the *Harrods* court noted, it is important to determine "whether the defenses may be adequately addressed in the alternative forum; whether all of the issues and parties in dispute may be joined and the conflict comprehensively adjudicated." 237 F. Supp. 2d at 443. In other words, recognizing and applying principles of international comity to the case at bar, as was done in *Harrods*, 237 F. Supp. 2d 444, would "frustrate fundamental interests or policies of the domestic forum," *Id*., and, moreover, lead to a judgment in Jamaica that is "predicated on laws inherently repugnant to fundamental public policies or notion of justice . . . [and] do violence to . . . important domestic interests." 237 F. Supp. 2d at 446.

FIRST CLAIM FOR RELIEF

DECLARATION: ANY JUDGMENT RENDERED AGAINST PLAINTIFF GUNST IN A DEFAMATION ACTION BROUGHT BY DEFENDANT SEAGA IN JAMAICA WOULD BE UNENFORCEABLE IN THE UNITED STATES

25. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 24 as if fully set forth herein.

26. For the reasons set forth above, and pursuant to 28 U.S.C. Section 2201, Plaintiff Gunst is entitled to a declaration that any judgment rendered against her as a result of a defamation claim brought in Jamaica by Defendant Seaga would be unenforceable in the United States.

SECOND CLAIM FOR RELIEF

DECLARATION: DEFENDANT SEAGA COULD NOT MEET HIS BURDEN OF PROVING FAULT ON THE PART OF PLAINTIFF GUNST

27. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 24 as if fully set forth herein.

28. Defendant Seaga indisputably is a public figure, having served in public office, achieving widespread international fame and recognition, as well as fame and recognition in the United States, and having enjoyed and used ready access to the media.

29. As a public figure, Defendant Seaga would be required to prove by clear and convincing evidence that Plaintiff Gunst acted with "actual malice" in the September 3, 1999 broadcast, and thus that Plaintiff Gunst communicated her statements during the September 3, 1999 broadcast knowing that the statements were false or were made with reckless disregard for their truth or falsity.

30. In fact, the statements broadcast by Plaintiff Gunst were true, or, alternatively, are not

capable of being proved true or false and were based on true information set forth in *Born Fi' Dead* and communicated during the September 3, 1999 broadcast.

31. Alternatively, since the matters at issue in the September 3, 1999 broadcast are indisputably matters of public interest and concern, Defendant Seaga could only prevail if he were able to prove that Plaintiff Gunst made such statements in a grossly irresponsible manner without due regard for the standards of information gathering and dissemination ordinarily followed by responsible parties involving similar matters.

32. Plaintiff Gunst did not make statements during the September 3, 1999 broadcast in a grossly irresponsible manner without due regard for the standards of information gathering and dissemination ordinarily followed by responsible parties involving similar matters.

33. Pursuant to 28 U.S.C. Section 2201, Plaintiff Gunst is entitled to a declaration that any defamation claim brought against her based upon the September 3, 1999 broadcast would be insufficient as a matter of law because Defendant Seaga would be unable to prove fault.

DEMAND FOR RELIEF

WHEREFORE, PLAINTIFF LAURIE GUNST respectfully demands judgment:

(a) declaring that any action brought to enforce the Judgment rendered against her as a result of a defamation claim brought against in Jamaica by Defendant Edward Seaga would be unenforceable in the United States;

(b) declaring that any defamation claim brought against her based upon the September 3, 1999 broadcast would be insufficient as a matter of law because Defendant Edward Seaga would be unable to prove fault;

(c) awarding Plaintiff Laurie Gunst her attorneys fees, costs and disbursements in prosecuting this action to the extent permitted by law; and

Case 1:05-cv-02626-DAB   Document 1   Filed 03/07/05   Page 12 of 13

(d) awarding Plaintiff Laurie Gunst such other and further relief as the Court deems just and proper.

Dated: March 2, 2005
New York, New York

PETER R. GINSBERG, P.C.

By:_____
Peter R. Ginsberg (PG-6712)
Carnegie Hall Tower
152 West 57th Street
New York, New York 10019
(212) 245-3430
(212) 245-3450 (telefax)

Robert N. Solomon
488 Madison Avenue
New York, New York 10022
(212) 825-5540